Mr. Falk, good morning. Thank you, Your Honor. May it please the Court, I'm Jerome Falk representing Appellant Ironshore and also speaking today for our co-appellants, the individual insurers. Three of them, Mr. Dobson, Mr. Tista, and Mr. Braun. The district court granted summary judgment largely because it concluded that there was no coverage at all as to any part of the underlying Invitex complaint. To persuade, I need only persuade you that there was some coverage to require reversal of the judgment, but it is our belief that this is not really a partial coverage case because every dollar sought as damages and every, the acts on which the complaint in Invitex rested all fell within coverage. Even though there were also legal theories based on the same acts and the same dollars sought that arguably were not covered. So this is not a case that combines factual events that are outside of coverage with factual events that are within coverage. It's all one set of facts, largely about the leverage buyout that had occurred here. So with that fundamental principle in mind, the principle that if a complaint alleges out of a single set of facts negligent conduct, and also the plaintiff has included a claim for intentional conduct, the presence of the claim for intentional conduct does not defeat coverage for the claim of negligence. It's a common-sense proposition, and I think it's applied every day when we see cases in which both negligence and intentional conduct. Hosein, counsel is going to say that it's not so common-sensical and that that same conduct triggers an exclusion. So what is your response to that? I don't know what the exclusion is, and I'll have to hear from him about it. But this policy, and we're really talking about the breach of fiduciary duty claim here. It's the overarching claim. Every dollar of damage is sought falls within the breach of fiduciary duty claim. This was a claim asserted against these three individuals who were officers or directors of the company, and they're alleged to have engaged in an LBO transaction that was improvident and beyond their fiduciary duty. That's the core of what a director's and officer's liability insurance policy is supposed to cover. And he's going to say, I mean, you're of course so familiar, but he's going to say that these same transactions were fraudulent conveyances, and so they are subject to, they sought restitution, and so they're not covered. And so what is your response to that? I realize you want the omnibus to go your way. He wants the omnibus to go his. It is a kind of a half glass, half full, half empty story. And of course, part of the answer to that is the nature of insurance coverage that you, and the proposition that these policies have to be construed against the insurer if they're ambiguous. But I don't think that. Is that what you're relying on? Not entirely. We are in part, and particularly in other parts of the case. Here, I'm really relying, I am relying on a common sense proposition. We see negligence claims all the time where there is in the complaint a claim of intent that would take the case out of coverage if it went to trial and intent were found. But that doesn't mean that there's no coverage. I see that under the rubric of brief fiduciary duties, some operative facts which are quite distinct one from the other. One group of operative facts are, to use some street language, that these three individuals stole the money that was borrowed for the leveraged buyout and put it in their pockets. That was an intentional act where they pilfered the corporate assets, right? Breach of fiduciary duty is a nice abstraction, but it was actually intentional theft. There's another group of claims that say as a result of their bad management, they expanded too fast. They were underfinanced, and they ruined the company through reckless business management. That's not so intentional. That could be negligence, right? That's right. As to the former, the defense is this is restitutionary damage. What you're trying to do is disgorge from these villains the money that they stole from the corporation. That is not covered by California law, right? Now, Judge Baird, I don't disagree with anything you just said, except that it's all one set of facts. The restitution claims, the fraudulent transfer claims, have nothing to do with the fact that the defendants got something, have everything to do with the fact that they got something, and nothing to do with the fact that they were officers or directors. Anybody can be on the receiving end of a fraudulent transfer. It's easier to steal from the corporation if you're the officers and directors. No doubt. But the claim doesn't depend on it. That's my point. On the other hand, the breach of fiduciary duty claim has nothing to do with whether they got something. It's whether they made improvident management decisions. So, but it's the same set of facts. And there are different legal theories attached to the facts. Now, it is a half-full, half-empty proposition. My position is that you don't lose coverage because the plaintiff has added a theory that would be outside of coverage. And I do want to remind the Court, and I'm sure you know this, this case was settled. It wasn't tried. None of these claims of bad conduct or stealing or putting things in their pocket was ever proven. It was settled for 10 cents on the dollar, less than 10 cents on the dollar, which tells you something about the strength of the uglier claims that were made by the plaintiff. I think that both sides of this case would agree that it was a very weak, a weak case to begin with, which is why it was settled so cheaply. So why don't you tell us what Judge Carter did wrong and why? Well, he found no coverage, and I think really for the reason we just discussed. He also found that there was no proof of damages because of the best evidence rule. And I think everybody, both sides now agree that was an erroneous ruling. Essentially, he thought that the glass was half-empty on Judge Carter's score sheet. He really thought that these claims overlapped entirely, I think. Right. And he didn't distinguish any breach of fiduciary duty claim. I think under, I think even opposing counsel. We'll see when he comes to the podium. I think even his brief acknowledges that there's a sliver that really doesn't arise from any alleged fraudulent transaction. There is a sliver, and that's enough to get us, you know, to require a reversal of the denial of any defense coverage here. But I think the difference between Judge – I'm sorry. Well, I didn't mean to – you were answering Judge Baez's question. Is that what you think Judge Carter did wrong? Well, it's only part of what I think he did wrong. Which is why we're here. The other part, the court – if you think, if your conclusion is that to the extent a defendant is sued for restitution and for damages, then to the extent that those, quote, damages really are overlapping of amounts that he got and shouldn't have gotten and that that's restitution, if you think that's outside of coverage, I don't agree with that. But if you conclude that, there's still a problem with what Judge Carter did. And that's because he lumped the three insureds together and treated them as an entity. But they're not an entity. They're three individual named insureds. Each has a right to reimbursement for defense costs and indemnity against loss. So taking the easiest one first, Mr. Braun. Mr. Braun was sued for $50-plus million on a joint and several liability basis for participating in decisions involving the LBO. He got $4.75 million. He wasn't even a shareholder. It was a bonus, as I recall. But it must have come out of the – or alleged to have come out of the LBO proceeds. So they said in the complaint, Braun is on the hook for this. Braun is being sued for $50 million because he got a $4.75 million bonus. He's got coverage. And the other two defendants could have settled around Braun and left him there. And he would – that the insurance company owed a duty to each of these defendants. Judge Carter's error, I believe, was that he lumped them all together as if they were an entity and said there is – there is no coverage. So that, in a nutshell, is what we think the error was once you get past the best evidence rule. Now – If you have a half-glass empty, half-glass full situation, there's also provision in the policy for allocating defense costs, isn't there? Yes. I was just going to turn to that. Good. Okay. So that's a wonderful segment. Okay. Thank you. There is a – I think no question that Twin City here paid no money, not a dollar. They offered some. They wrote a lot of letters. They wrote a lot of letters, but they never wrote a check. Well, that's because you got the letter and told them to, you know, throw it away. I didn't do anything, but I – I don't mean you, but I mean – But, no. So they only got the letter and didn't take them up on their offer. They made proposals that were lowball proposals, and the insurers didn't accept it. So just quickly, while we're here, are you going to contest whether your client obtained their consent to settle? No. All right. Thank you. No. They didn't. So they did make an offer to split some costs with you, which your folks turned down. Right. They didn't consider it. What's the significance of that? And they stood on their – but, you know, there was nothing – there was nothing that prevented the insurance company from writing – for writing a check for the amount they thought they owed. They took the – they wrote letters that said there are no defense costs to be covered. They had various explanations, but the bottom line is they paid nothing. And – Mr. Falk, Mr. Falk, let me ask you this. Did the insurance company ever make an unconditional offer to pay 10 to 15 percent of the advance – of the defense costs without a reservation of rights under the policy in which they retained their position that there would be no payment until a $75,000 retention were paid? They never – they never made a – an unconditional offer to pay anything. That's right. And more importantly, Judge Bea, they denied coverage. Over and over and over and over again denied coverage. And our reply brief lists the places and footnotes. We quote them. There are even more examples that could be found. They denied coverage on a – this is not just a reservation of rights. We're not sure. We need more facts. This was – we've looked at it and there are a bunch of reasons why there are no coverage. It's a position that is mirrored in the brief you have before you. So you don't contest that your client didn't obtain their permission to settle the case, which is a breach. Yes. Or give notice. Judge Carter clearly found that. And you're essentially arguing that they breached first by denying coverage. Under California law, the – there are two things. Denial of coverage is itself – unequivocal denial of coverage is itself enough to release an insured from the duty to get consent. Is that as a matter of law a material breach under the contract? It is. And in addition to the cases that I – that I cited, I just would like to add one more because it particularly applies to the – to the consent clause. And that's the Diamond Heights case, 227 Calab III, 563 at 581. The other cases don't specifically mention consent clauses and this one does. I think you were starting to tell us about why the offer to allocate costs doesn't change matters. You got derailed from your answer. I did get derailed. The allocation under California law of defense costs is governed by one rule and the allocation of settlement proceeds is governed by another. The defense costs are governed by the reasonably related standard. And that's described in our opening brief at 37 to 38. The settlement amount is under what California courts call the larger settlement rule and we describe that on page 62 of our opening brief. That's where you take the settlement amount and it's all covered unless – But there was policy language that dealt with it. I just wanted to, if I could, just set the – because this is what we think is applicable. The settlement amount under the California rule is that if there's a settlement, there's coverage except to the extent the settlement amount was increased marginally by the presence of the uncovered claim. Now, in – and they can't make this showing and they never tried. There is an allocation provision. It's at page 570 of the excerpts of record. That provision, we cover in our brief several different reasons why that provision doesn't apply or has been waived. But let me just take one because I'm really out of time here. The one that I think is easy and dispositive is that this policy provision only applies when the claim, quote, includes both covered and uncovered matters. Not cause of action, claim for relief, not legal theories, but matters. And I've already said enough, I think, to show you why these are not different matters. They're different legal theories based on the same set of facts involving the same dollars. And if matters were construed differently than in my simple example of a complaint alleging negligence and intentional conduct, what would you do? Split the defense cost 50-50? It would be crazy. At worst, from my point of view, this is an ambiguous provision that under the usual rules applicable to insurance policies has to be construed against the insurer. I am so out of time. Thank you, Mr. Baldwin. Thank you. Thank you very much. Good morning. Good morning, Your Honors. My name is Michael Perlis. I'm here on behalf of Twin City. Seated with me is my colleague, Ms. Carrie Economo. There are a few things with which I disagree with Mr. Falk. The first is that Judge Carter said there was no coverage at all. Judge Carter said no such thing. There were two elements, really, in connection with the motion for summary judgment. The first related to the issue of whether or not a sufficient showing had been made to entitle the appellants to any attorney's fees. And the second was whether or not the appellants had breached the no voluntary payments provision by settling the case without notice or consent. And not only settling the case without notice or consent, but actually misrepresenting to Twin City the status of settlement negotiations after Twin City had come to the table, had put $750,000 down as a proposed settlement offer to match Ironshore's $750,000. Mr. Perlis, let me ask you a question. Did you ever offer the $750,000 contingent upon proof that the insured had first spent $75,000 to conform with your claim of retention? The $750,000, Your Honor, was offered unconditionally. Where was that in the record? The issue is in connection with correspondence, Your Honor, between myself and Mr. Miller. And I think there is a letter from me dated July, I think it's July 14th, 2011. I think there's a May 26th, 2011 letter authorizing $750,000. And then there's another one where I said I think we put $750,000 on the table. Let us know what happens. You can't offer any more unless you get our consent. Is it true that you denied coverage from the get-go? No. How do we understand that? Let me hear the answer to that. No, Your Honor. There are a series of facts which Mr. Faulk conflates. The first issue was a tender to us in 2009 of a notice of facts and circumstances. We were told that the creditors committee might consider a claim or might bring a claim. That's not a claim under the policy. We acknowledge the notice of facts and circumstances. That then triggered a letter from Mr. Purcell, Mr. Miller's partner, saying, in essence, you're in bad faith. This claim has been going on for some period of time. He sets forth a series of events. That triggers a response from Twin City, which says, you've now told us there is a claim that has been going on for some period of time that predates the policy, and therefore, for among other reasons, there can be no coverage. That triggers yet another bad faith letter from Mr. Miller saying that really isn't when the claim started. Then there is a demand from the creditors committee of $9.5 million. That triggers a denial on the grounds that it is a fraudulent transfer demand. It is disgorgement restitution. And also, it's an insured versus insured exclusion since it's the creditors committee making the demand on behalf of the corporation's claims. Then there's a lawsuit. The Twin City is sued by the appellants. There's a motion to dismiss. That ultimately, that suit is dismissed without prejudice. In August of that year, 2010, the creditors committee files a lawsuit. At that point, there are 11 causes of action, 10 for fraudulent transfer, 1 for breach of fiduciary duty. The fraudulent transfer claims are, in our view, not covered because they seek disgorgement or restitution. We indicated that while we did not believe there was coverage for the fiduciary duty breach, out of an abundance of caution, we were prepared to advance on an allocated basis 10 percent, but were prepared to discuss with them any other number provided they were prepared to address the allocation provision of the policy. They refused, consistently demanding 100 percent coverage until January where Mr. Miller wrote us a letter saying, you've worn my clients down, I'll take 55 percent. But it was 55 percent of non-covered matters as well as arguably covered matters, 55 percent of a $4.6 million settlement, 55 percent of pretender matters, 55 percent without regard to reasonableness, and what Mr. Miller didn't disclose at that time is Iron Shore had already offered to pay him 100 percent of the costs so that he was really going to get something potentially in excess of 100 percent of his costs. We said that didn't seem to be reasonable, but we went up to 15 percent and said we're prepared to discuss higher percentages. That triggered the lawsuit. Okay. I think Judge Christin did. In terms of ‑‑ I did have a question, counsel. Why isn't the October 18th, 2009, or the December 2nd, 2009 letter, either of those letters, why are they not denials of coverage? In December of 2009, that is a denial of coverage, but that's with respect to the 9.5 million demand for fraudulent transfer claims made by the creditors' committee. So in our view, if it was only fraudulent transfer, and, in fact, Mr. Miller wrote a letter to the creditors' committee saying it was fraudulent transfer, that in and of itself is a restitutionary claim alone. There was no mention of, I believe, Mr. Braun. There was no mention of fiduciary duty, and so we denied it on the basis of insured versus insured and discordant restitution, the Bank of the West and its progeny. And Judge Carter found on the insured versus insured? Judge Carter found the insured versus insured in the context of the motion dismissed did not apply. Right. Because at that point, it wasn't the creditors' committee that was bringing the claim. It was the trust that was established pursuant to the plan of reorganization, and there was a trustee appointed by the bankruptcy court in the InvoTax matter that brought the claim. I think your answer to my question is that you interpret this letter to not be a denial, or at least to be a denial at that point because the only claim that was made was purely restitutionary. That's correct. No breach of fiduciary duty. That's correct. And when the fiduciary duty breach claim was asserted, we applied the allocation provision of the policy. We wrote them about a 20-page letter explaining our views and offered 10 with a position that we're prepared to discuss anything, asked them for their analysis, etc., and we got nothing back. So I've read the 20-page letter. And can you remind me of the date of the 20-page letter? October 5th. Okay. And what's your position on the first time you ever heard that there was a breach of fiduciary duty claim as well as a fraudulent transfer? When the complaint was filed, we saw there was a claim for breach of fiduciary duty. And that complaint was filed in August of 2010. August of 2010. All right. Thank you. That was the first time we heard it. And let's talk about our payment of attorney's fees and the retention. It's important to understand, although appellants suggest that our policy is a Side A policy, it is not. It is a Side A, B, C, and there's a D even coverage. The reason one buys an Ironshore policy, which is a Side A difference in condition policy, is it fills the gaps between a policy like Twin Cities and what is provided by Ironshore. So Twin City has a retention. Ironshore doesn't. Twin City has an allocation provision. Ironshore doesn't. Twin City has certain exclusions. Ironshore doesn't. The Ironshore policy specifically states that if Twin City doesn't pay for any reason, which may include its allocation provision or whatever, the Ironshore policy immediately must drop down and make the payment. Ironshore didn't do that. What Ironshore did was kept writing to the insured saying that the Twin City has to exhaust its coverage before we come in. And it was only when Ironshore was threatened with suit that it finally decided it was going to pay something. And that was in January of 2000. So your position is that Ironshore had a drop-down policy rather than a following-form policy? That is correct. That's what the Ironshore policy says. And I don't think there's any serious dispute as to that. Our view was, A, we were prepared to pay 10 and then 15 percent of covered costs subject to the retention, provided that somebody told us what the bills were. We had difficulty getting bills. They were sending us bills in six figures for expenses pre-tender. They were sending us bills for defense counsel we never approved. They were sending us bills for unreasonable defense costs. They were sending us bills, and they're in the record, for Kay Scholer representing Griffin Company that wasn't even insured in six figures. They were sending us bills for Delaware Counsel, for Bankruptcy Counsel, for Real Estate Counsel. And we didn't even get those until ultimately, and not even completely, until May of 2011 when we started reviewing them. But we also knew Ironshore was paying, and we tried to get from Ironshore an understanding of what they had paid so that we wouldn't pay twice. And then we would sit down with Ironshore and try to decide who owed what to whom. But even at the date of the argument on the summary judgment motion before Judge Carter, Ironshore couldn't represent to the court what, in fact, it had paid. So we were in no position, based on the conduct of the appellants, to know what our 15 percent would have been. And Judge Carter said, recognizing that some of the evidence submitted was not the best evidence, that the appellants had made no showing that anything was covered as a defense cost. Let me ask you about that. You didn't object to the evidence on best evidence grounds, did you? No, we did not, Your Honor. Am I right? If you don't object to evidence on best evidence grounds, it's waived? That would be my view, but I think the Court reserves the right to say whatever it wants to say with respect to the evidence. But I do want to make two more points, Your Honor, if I may. One is, this whole issue is a non-issue to the extent that the Court believes that the prior pending and claim first made provisions apply. And Mr. Faulk has basically admitted that they do. He has said that the overarching claim is the breach of duty claim. While I dispute that, at page three of his brief, the opening brief, he says, the suit alleged an overarching claim based upon all the wrongful acts alleged in the complaint, that the insureds breached their fiduciary duties by mismanaging the business, causing or allowing fraudulent business practices, and approving a leveraged buyout transaction. The LBO transaction is basically just another name for getting the money back. But the fraudulent business transactions is, in fact, the claims we say relate back to the pre-policy claims relating to the Orange County District Attorney's Office and the Bureau of Legal Advocacy. Consumer fraud claims. Aren't those consumer fraud claims at court? Yes, they are consumer fraud claims. And if you look at the InvoTex complaint, those consumer fraud claims. They're mentioned. 39 paragraphs. And if you look at the claim for breach of fiduciary duty, there's a whole section on those consumer fraud claims. InvoTex's counsel, Mr. Kotler, testified that in his view, the whole LBO transaction was a means pursuant to which these insurers were able to get out of dodge, were his words, quickly after the BAR and OCDA complaints. The bankruptcy-appointed financial officer said the same thing. Mr. Dobson, Mr. Teissner said the company's bankruptcy was in some measure precipitated by these consumer fraud complaints. But what about the point that – I appreciate your arguments. It's just that opposing counsel's response is that this wasn't really litigated. What we have is a coverage dispute, and there's a whole bunch of allegations, you know, sort of back and forth. Well, the policy only requires an allegation. It doesn't require proof. Right. And his point is there's an allegation of breach of fiduciary duty. But the question then becomes if you look at what the policy says with respect to prior pending or claim first made, it says any allegation of any fact, circumstance, et cetera, et cetera. But one other thing. It has a second condition in ER 170, paragraph 4 sub c. It says that the claim has to be a notice under a policy for directors and officers or mismanagement or similar policy. Where is the evidence that there was a prior policy in effect when the claim was made? There was. It was tendered to National Union Fire Insurance Company, and that policy was exhausted through the payment of defense costs and settlement claims in connection with those matters. And where is the record evidence that that policy was for mismanagement as required under 4 sub c. ER 170? It was a directors and officers policy, and it is contained at our supplemental excerpt 626 to 766. That's the entire National Union policy. And that was the one that was triggered by the prior claim. All right. But there's something in the excerpt at 790. National Union tells EZ Lu that this matter does not involve a claim, quote, does not involve a claim as defined by the policy, and no claim has been made against and insured. Is there something in the record that confirms that you are? In terms of tendering, the fact that National Union took the position. Well, no, no, no. So I'm asking, you just made a representation about the policy being exhausted. Do I have that in the record? No, what I'm saying to you, Your Honor, is that with respect to the National Union policy, with respect to the BAR and OCDA claims, National Union accepted coverage. And my question, sir, is where is that in the record? Oh. What you just represented, I think, is not in the record. I'm inviting you to show me where that's in the record. Okay. Let me have my colleague check that out, Your Honor. Now, with respect to the allocation provision of the policy, every court has recognized that the parties are free to contract away from the default rules relative to California's determination as to relative legal, I mean, as to reasonably related for defense costs and larger settlement with respect to indemnity. In this case, the parties did that. Mr. Faulk makes the point that matter is a vague and ambiguous term. Well, if you look at all of the cases that have considered this larger settlement allocation provision, they all use the term matter. And matter is defined in the dictionary. And the dictionary definition, I think, makes clear what we're talking about, that in a particular claim, and a claim is defined as a single complaint, there may be matters in that complaint that are covered and matters that are not covered, parties that are covered, in this case, Greif and Company and EZL1, and parties that are covered. And one has to allocate on that basis. My guess is if you looked at the Ironshore directors and officer policy on the Internet, it would say matters as well, as does every other policy that we've quoted in the cases we've cited in our brief. I think your colleague has something for you there, and then we'll wrap it up. Yes, the notice to national union under the DA and Orange County matter is TCER 784. All right. My question is, is there anything that I'm not looking at notice. I'm looking for record support for your statement that that policy was exhausted. Oh, you may have that, Your Honor. Okay. Am I out? It says 120. You're out. Over 120. Thank you, Your Honor. Thank you. We'll give Mr. Falk a minute in rebuttal. Thank you, Your Honor. Thank you, Mr. Perlis. Sorry. All right, now. Counsel, what's the first notice Twin City had that there was a breach of fiduciary duty claim? He says it was the complaint, the InvoTex complaint. Is that do you have a different version of that? I'm not. Well, we quote in the brief. I don't have it at my fingertips, but we quote in the brief some somewhat vaguer language in the earlier communications. From the committee. From the committee that is broad enough to cover it, and they followed up with the complaint. But I take his point. Let me just, on the denial of coverage, at 1140 of their appendix. This is a letter from Mr. Perlis, dear Skip, to Mr. Miller, who's sitting behind me. I think we have reached a point where we must agree to disagree. Twin City stands behind its declination of coverage based on, among other things, the policies ensured via ensured exclusion. Nothing that happened thereafter changed that. They never withdrew their utter and complete denial of coverage. They never qualified it. There were lots of talks and settlement proposals, but there was never we no longer deny coverage letter. Not never. Well, if they offered $750,000 unconditionally, isn't that inconsistent with the denial of coverage of defense costs? Well, they did put that money. They did do that. And and but they denied coverage. And I think under the case, you know, I'm I'm not responsible for the facts. I can only report them. They denied coverage in writing over and over again. And then I guess because they well, they actually wrote a letter in which they said they were offering 10 percent out of an abundance of caution. This is an insurance company has got to be a little worried about its bad faith exposure. So maybe they put some money up. It was a very small amount unjustified. But don't actions speak louder than words? Words in a letter denying coverage are actions. That's an action. So I don't think I I don't think I can agree with you on that one, Judge. They wrote a letter saying we have no coverage. And they never actually wrote a check for a dollar or a dime. They never paid any money. They had denied coverage. And that's enough for us. I do want to make one. Let me ask you to finish your finish your thought and then we'll conclude. I I they with respect to the the other part of the prior notice point, I didn't get a chance to speak to that. And that other that national union policy is a combined policy. It is. It does have a DNO component, but it also has a CGL component. And this claim, this notice that they gave to national union had to be under the heading of the CGL part of the policy, because the BAR claim to which it related was a claim against the company, not against a director, not against an office. We cover that in the report. Thank you, Mr. Faulk. Mr. Perlis, thank you as well. The case just argued is submitted.
judges: Silverman, Bea, Christen